**Electronically Filed**
**Intermediate Court of Appeals**
**CAAP-10-0000027**
**31-MAY-2012**
**08:18 AM**

NO. CAAP-10-0000027

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


STATE OF HAWAI'I, Plaintiff-Appellee,
v.
JANIS OKAWAKI, Defendant-Appellant


APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT
(FC-CRIMINAL NO. 10-1-1817)

MEMORANDUM OPINION
(By: Nakamura, C.J., Foley and Fujise, JJ.)

Defendant-Appellant Janis Okawaki (Janis) appeals from the Judgment of Conviction and Sentence (Judgment) filed on August 24, 2010 in Family Court of the First Circuit[1] (family court). Family court found Janis guilty of one count of Criminal Contempt of Court, in violation of Hawaii Revised Statutes (HRS) § 710-1077(1)(g) and (3)(b) (1993).[2]

---

[1] The Honorable Darryl Y.C. Choy presided.

[2] HRS § 710-1077 provides, in pertinent part:

§710-1077 **Criminal contempt of court.** (1) A person commits the offense of criminal contempt of court if:

. . . .

(g) The person knowingly disobeys or resists the process, injunction, or other mandate of a court;

. . . .

(3) The court may treat the commission of an offense under subsection (1) as a petty misdemeanor, in which case:

On appeal, Janis contends family court (1) committed reversible error when it found Janis guilty of Criminal Contempt of Court and (2) abused its discretion when it failed to suspend trial proceedings for a mental examination to determine penal responsibility, or in the alternative, the failure to do so was plain error.  Janis also contends defense counsel provided ineffective assistance of counsel by (1) failing to move for a mental examination to determine penal responsibility and (2) failing to object to the closing argument of the State of Hawai'i (the State) when it argued, based on excluded evidence, that Janis acted knowingly.

## I.  BACKGROUND

Irene Okawaki (Irene), Janis's mother, filed a "Petition for an Order of Protection" (Petition) against Janis in family court on May 17, 2010.  Family court issued a Temporary Restraining Order (TRO), effective until August 15, 2010, prohibiting Janis from contacting Irene or entering Irene's home. Police Officer David Deitschman (Officer Deitschman) served the TRO on Janis at Castle Medical Center's Behavioral Health Ward on May 18, 2010.

Service included notice of a hearing scheduled for June 1, 2010, where Janis could show cause why the TRO should not be in effect.  Janis failed to appear at the hearing.  Family court took "no further action" and ordered the TRO to remain in effect until August 15, 2010.  Irene received a copy of the "Order Regarding Temporary Restraining Order," but there is no proof of service that Janis received a copy.

----

. . . .

(b)    If the offense was not committed in the immediate view and presence of the court, nor under such circumstances that the court has knowledge of all of the facts constituting the offense, the court shall order the defendant to appear before it to answer a charge of criminal contempt of court; the trial, if any, upon the charge shall be by the court without a jury; and proof of guilt beyond a reasonable doubt shall be required for conviction.

On August 9, 2010, Janis called Irene several times in the middle of the night, leaving three phone messages. These phone calls allegedly violated the TRO and Irene filed a report with the Honolulu Police Department. Janis was arrested later that day.

The State filed a Complaint on August 10, 2010, charging Janis with the petty misdemeanor of Criminal Contempt of Court, in violation of HRS § 710-1077(1)(g) and (3)(b). The State alleged Janis "did knowingly disobey or resist the process, injunction, or other mandate of a court, to wit, the [TRO] issued in FC-DA No. 10-1-0856 on the 17th of May, 2010[.]"

A bench trial was held on August 23 and 24, 2010. At its conclusion, family court found Janis guilty of violating the TRO and entered judgment, sentencing Janis to jail for a term of ten days with credit for time served. Because she had been in jail longer than ten days, she was subject to immediate release.

On September 15, 2010, Janis timely appealed from the Judgment.

## II.  STANDARDS OF REVIEW

### A.  Sufficiency of the Evidence

The appellate court reviews the sufficiency of evidence on appeal as follows:

> [E]vidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.

State v. Richie, 88 Hawai'i 19, 33, 960 P.2d 1227, 1241 (1998) (quoting State v. Quitog, 85 Hawai'i 128, 145, 938 P.2d 559, 576 (1997)). "'Substantial evidence' as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." Richie, 88 Hawai'i at 33, 960 P.2d at 1241 (internal quotation marks and citation omitted).

B.   Plain Error

"Normally, an issue not preserved at trial is deemed to be waived.  But where plain errors were committed and substantial rights were affected thereby, the errors may be noticed although they were not brought to the attention of the trial court." State v. Fagaragan, 115 Hawai'i 364, 367-68, 167 P.3d 739, 742-43 (2007) (internal quotation marks, citations, and brackets omitted).

C.   Fitness to Stand Trial

"[A] trial court's ruling with regard to a defendant's fitness to proceed is appropriately reviewed on appeal for an abuse of discretion."  State v. Castro, 93 Hawai'i 424, 426 n.1, 5 P.3d 414, 416 n.1 (2000) (hereinafter, Castro II).

### III.   DISCUSSION

A.   Family court did not commit reversible error when it found Janis guilty of Criminal Contempt of Court.

Janis contends family court's verdict went against the weight of the evidence and was not supported by substantial evidence that she "knowingly" violated the TRO.  On appeal, Janis argues her psychiatric condition influenced her belief that the TRO was not in effect at the time she allegedly violated it.  She also argues her psychiatric condition led her to believe service was not valid.  Based on those beliefs, Janis argues there was not substantial evidence that she "knowingly" violated the TRO, as required by statute.  "The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact."  Richie, 88 Hawai'i at 33, 960 P.2d at 1241.

At trial, Officer Deitschman testified he personally served the TRO on Janis at Castle Medical Center's Behavioral Health Ward.  He explained he did not serve the TRO until after a doctor confirmed Janis was "stable enough to be served."  Officer Deitschman testified that he told Janis the TRO meant she could not go home after she was released from the hospital.  He

4

attested that he did not threaten her in order to obtain her signature on the proof of service form. The TRO, with Janis's signature of proof of service, was admitted into evidence.

While Janis was on the stand, she testified that when she was released from the hospital, she went with a case manager to pick up belongings from her mother's house "because of the temporary restraining order." Janis confirmed she did not attend the June 1, 2010 hearing at which she could have contested the TRO. She contended that because no papers were served telling her what transpired at the hearing, she didn't know "whether or not the restraining order was valid."

Janis testified she could not go home on August 9, 2010 because "my mom in her mind thinks there's a TRO." In the August 9, 2010 phone messages Janis left on her mother's answering machine, she specifically stated that "if I'm violating the temporary restraining order, why aren't you calling the police[?]." On the other hand, Janis testified the police told her she would not be violating the TRO if she called Irene or went home.

Janis also asserted at trial that the TRO was a contract that required a "meeting of the minds." She argued the TRO was invalid because she signed it while she was in the "psych. ward" and "[h]ow can you have meeting of the minds if you're in a psych. ward?" which "out of definition tells you I wasn't in my right mind."

When Janis testified she did not believe the TRO was valid, she was apparently presenting a "mistake of law" defense. "Mistake of law" is an affirmative defense, pursuant to HRS § 702-220 (1993).[3] However, Janis points to no erroneous

---

[3] HRS § 702-220 provides:

§702-220 **Ignorance or mistake of law; belief that conduct not legally prohibited.** In any prosecution, it shall be an affirmative defense that the defendant engaged in the conduct or caused the result alleged under the belief that the conduct or result was not legally prohibited when the defendant acts in reasonable reliance upon an official statement of the law,

"official statement of law" upon which she relied. Janis's argument at trial suggests that even though she knew there was a TRO, she decided it was not valid and therefore, she did not "knowingly" violate it. However, testimony from Officer Deitschman suggests Janis understood she was served with a TRO. Other acts indicating Janis was aware a TRO was in effect included going with a case manager to the house to pick up belongings and telling the police she could not call or go home because of the TRO. On the other hand, her belief that the police told her there was no valid TRO suggests she might not have "knowingly" violated the TRO when she called her mother.

Viewing the evidence in the strongest light for the prosecution, there was substantial evidence that Janis knowingly violated the TRO. Richie, 88 Hawai'i at 33, 960 P.2d at 1241.

B.    Family court abused its discretion when it failed
      to suspend trial and appoint an examiner to report
      on the physical and mental condition of Janis
      before determining her fitness to stand trial.[4]

Janis contends family court had a duty to order *sua sponte* a hearing to determine Janis's fitness to stand trial. Family court's determination that Janis was fit to stand trial is reviewed on appeal for an abuse of discretion. Castro II, 93 Hawai'i at 425, 5 P.3d at 415.

---

afterward determined to be invalid or erroneous, contained in:

(1)    A statute or other enactment;

(2)    A judicial decision, opinion, or judgment;

(3)    An administrative order or administrative grant of
       permission; or

(4)    An official interpretation of the public officer or body
       charged by law with responsibility for the interpretation,
       administration, or enforcement of the law defining the
       offense.

[4] Although Janis refers to family court's duty to "determine penal responsibility," she argues the court's duty to determine "fitness to proceed." Therefore, we analyze family court's duty to determine Janis's fitness to proceed to trial.

To have been competent to stand trial, Janis must have had the capacity to understand the proceedings against her and to assist in her own defense. HRS § 704-403 (1993);[5] State v. Janto, 92 Hawai'i 19, 28 n.3, 986 P.2d 306, 315 n.3 (1999). If a trial court has "reason to doubt the defendant's fitness to proceed, or reason to believe that the physical or mental disease, disorder, or defect of the defendant will or has become an issue in the case, the court may immediately suspend all further proceedings in the prosecution." HRS § 704-404(1) (Supp. 2011) (emphasis added). At that point, the court "shall appoint . . . one qualified examiner in nonfelony cases to examine and report upon the physical and mental condition of the defendant." HRS § 704-404(2) (2011) (emphasis added).

The Hawai'i Supreme Court has observed that "only some rational basis for convening a panel is necessary to trigger the [trial] court's ... power to stay the proceedings and, thereafter, to appoint examiners." Castro II, 93 Hawai'i at 427, 5 P.3d at 417 (internal quotation marks omitted). Where there is a rational basis to have reason to doubt a defendant's fitness to proceed and reason to believe defendant is suffering from a physical or mental disease, disorder, or defect that had affected his ability to assist in his own defense, the court must *sua sponte* order a competency hearing. State v. Castro, 93 Hawai'i 454, 462, 5 P.3d 444, 452 (App. 2000) (hereinafter, Castro I) (Acoba, J., concurring opinion, adopted in its entirety in Castro II, 93 Hawai'i at 427, 5 P.3d at 417).

---

[5] HRS § 704-403 provides:

§704-403 **Physical or mental disease, disorder, or defect excluding fitness to proceed.** No person who as a result of a physical or mental disease, disorder, or defect lacks capacity to understand the proceedings against the person or to assist in the person's own defense shall be tried, convicted, or sentenced for the commission of an offense so long as such incapacity endures. (Emphasis added.)

Where a question of fitness to stand trial is raised, it is best resolved at the pretrial stage. The Hawai'i appellate courts have reasoned that

> [s]uch a practice removes from trial the concern that incapacity which is not readily apparent to lay observation will surface during trial proceedings or, much worse, after trial has ended. Obviously, if a defendant is found fit to proceed based upon expert testimony in the record, the question of whether an examination should have been judicially ordered or not is largely removed from judicial re-examination.

Castro I, 93 Hawai'i at 462, 5 P.3d at 452.

Here, family court abused its discretion when it failed to stay the proceedings and appoint a qualified examiner to examine and report on Janis's physical and mental condition. Either in response to the State's concerns about Janis's fitness to proceed or *sua sponte*, the court had a rational basis to have "reason to doubt [Janis's] fitness to proceed, or reason to believe that a physical or mental disease, disorder, or defect will or has become an issue in the case[.]" See Castro I, 93 Hawai'i at 462, 5 P.3d at 452 (brackets and ellipsis omitted).

Prior to trial, the State noted before family court that Janis had been uncooperative with previous counsel "and was not participating meaningfully in her defense." The State pointed out that it had "certain concerns because she does suffer from mental illness and she may not be having all of the medications available to her at OCCC. [The State] understand[s] that [Janis] may be just taking a mood stabilizer, but there are other medications she does need to take." The State also mentioned that Janis "was not able to be rational in court at the last court date such that Judge Loo had to kick her out of the courtroom because she was not able to follow court orders . . . or remain silent." The State then requested a "one-panel colloquy."

In response, family court entered into a brief colloquy with Janis, in which the court established that Janis "was feeling fine today" and she understood she was charged with

8

contempt of court. The court explained to Janis that she needed
to be able to assist her counsel, stating:

> THE COURT: That's what we talk about being able to assist in your defense, able to listen to what the witnesses against you are saying, and of course I'm not saying that what they're saying is true now, but you're able to look at it, hear it, and tell your lawyer, nah, that's untrue, this is what happened.
>
> THE DEFENDANT: Uh-huh.
>
> THE COURT: Okay. That's what I call assisting the defense. In other words, you can understand what's going on and you can understand the strategy and tactic of how to win the case.
>
> THE DEFENDANT: Right.
>
> THE COURT: Okay. And my understanding is that you're okay, you can understand this stuff.
>
> THE DEFENDANT: Right. Uh-huh, I not going get a one-panel?
>
> THE COURT: well, wait, wait
>
> THE DEFENDANT: I just wanna
>
> THE COURT: no, wait –
>
> THE DEFENDANT: prove them wrong.
>
> THE COURT: -- no, no, no. No. We're not even gonna do a one-panel. Okay.
>
> THE DEFENDANT: Okay.
>
> THE COURT: Okay. If I understand that's fine, okay, that you can handle this and you can help your lawyer fight the case, --
>
> THE DEFENDANT: Uh-huh.
>
> THE COURT: -- no need one-panel.
> THE DEFENDANT: Okay.
>
> . . . .
>
> THE COURT: But we cannot have the trial though if you're unfit. Because as -–
>
> THE DEFENDANT: No, I'm fine.
>
> THE COURT: -- I speak to you -- okay. And being feisty don't count.
>
> THE DEFENDANT: Uh-huh.
>
> THE COURT: It's okay. Feisty is cool.

THE DEFENDANT: I know. Every time I get feisty, I'm told I'm mentally ill.

THE COURT: Well –

THE DEFENDANT: I don't know what's wrong with people.

THE COURT: -- well, [Janis], I know there's a difference.

THE DEFENDANT: Uh-huh.

THE COURT: Okay. But sometimes you get too feisty, you might kinda fall into unfit. I don't know.

THE DEFENDANT: Uh-huh.

THE COURT: All right, so at this point now, if you think you can handle, we can proceed to trial.

Trial commenced later that day. When Irene testified, she stated Janis had mental illness and had been committed at various times to the mental health unit at Castle Medical Center. Irene had indicated in her Petition that Janis was "diagnosed as being bipolar" and became aggressive during "manic" periods. Irene also testified that when the TRO was served, Janis was in Castle Medical Center "because of her mental illness." Irene confirmed Janis did not have a multi-million dollar trust fund, but did note that a trust would come into existence upon Irene's death.

Officer Deitschman testified he served the TRO on Janis at Castle Medical Center's Behavioral Health Ward after a doctor confirmed Janis was "stable enough to be served."

During the testimony of Irene and Officer Deitschman, Janis made several loud, inappropriate comments. At one point while Irene was on the stand, Janis stated, loud enough to be captured in the transcript, that "I'm just gonna fuckin' sue her personally." During Officer Deitschman's testimony, she interjected the following comments: "This is so bad[;]" "She's such a bad mother[;]" "See, how come they know so much of my business[;]" and "Tell him I wasn't in my right mind."

After the State rested its case, family court read Janis her <u>Tachibana</u> rights, which Janis indicated she understood. After consulting with defense counsel, Janis took the stand.

While Janis was on the stand, she testified that the police and her personal banker told her she has a multi-million dollar trust fund, but she was "thrown in the psychiatric ward" any time she asked about it; "the police, secret service, and the FBI" filed reports against her mother "all the time;" she "own[s] the bank;" and she has a law degree, even though she only completed one year of law school. She also testified she had been committed to a psychiatric ward at least fifty times. She said the police told her she would not be violating the TRO if she called Irene. She claimed the police hated Irene, told Janis the TRO was "bogus," and assured her that "if your mom doesn't let you in the house, call us back and we'll kick her out." Janis also claimed that someone from Queen's Medical Center assaulted her and "stole $2,000" from her.

On cross-examination, Janis entered into a protracted discussion with the State regarding the charge against her. The State appears to have had renewed concerns about her capacity because it attempted to reaffirm Janis's understanding of the proceedings.

> PROSECUTOR: Okay. So, [Janis], I just want to establish your understanding of what is going on right now. Okay?
> What is currently the charge that is against you that you are facing trial against right now?
>
> DEFENDANT: Again, I don't know. I don't understand what a con -- restraining order contempt of court is because I was told when I talk -- when I looked it up in the law library at the OCCC 'cause you guys gave me too much time to think about it, I found out contempt of court means I didn't show up or the judge gives me a contempt of court, not the prosecutor. So I don't -- I have absolutely no idea what you guys are talking about.
>
> . . . .
>
> DEFENDANT: Look. I don't know what you talking about, okay? 'Cause seriously, I looked it up in the law library.
>
> PROSECUTOR: I --
>
> DEFENDANT: I don't know what you talking about. So I'm -- I'm -- I'm gonna answer you again, I don't know what you talking about. That is a defense. I don't know what you talking about.
>
> . . . .

PROSECUTOR: Okay. [Janis], right before this trial started I read you the charges against you, --

DEFENDANT: Yeah, --

[PROSECUTOR]: -- the charge -

[DEFENDANT]: -- the charges. That's different from the law. Don't you understand that? The law is the -- what's in the text books and what's in case law. That's the law. Where in your brief do you have any laws? There is none. You just wrote any kinda stuff you felt like it. And then you expect everybody to agree with you. I -- that's what my ar -- my attorney's arguing against. There is no law. You have to base it on something. Statute, Hawaii Revised Statutes -- um, not -- section something. Or -- or case law. Brown v. Board of Education. 95 whatever ver -- that -- I mean, didn't you pass legal -- legal re -- research and writing? That's basic procedures. I don't understand what you're asking me.

[PROSECUTOR]: Okay. I'm not even·asking about -

[DEFENDANT]: You asked about the law. I don't know. You're the lawyer. Why are you asking me?

[PROSECUTOR]: Because I'm trying to make sure you understand the proceedings against you right now.

[DEFENDANT]: I do understand the proceedings.

[PROSECUTOR]: Okay.

. . . .

[PROSECUTOR]: I'm asking you do you understand why you are here today -

[DEFENDANT]: Right.

[PROSECUTOR]: -- and why you're fighting this case.

[DEFENDANT]: And I'm asking you the same thing.

[PROSECUTOR]: This is not a question and answer where you get to ask me questions. I'm asking you the questions, answer it.

Family court intervened to halt the exchange and attempt to establish again that Janis understood the charge against her.

THE COURT: Okay. I know now there's a big discussion with you and the prosecutor that this is bogus, this is all screwed up, not written properly.

THE DEFENDANT: Right.

THE COURT: Okay. Be that as it may though, --

THE DEFENDANT: Okay.

THE COURT: Okay? You understand –

THE DEFENDANT: Uh-huh.

THE COURT: -- now?

THE DEFENDANT: Uh-huh.

THE COURT: Okay. So we don't go through the wisdom of this. We just go through what it says.

THE DEFENDANT: Okay.

THE COURT: Okay. With that understanding now can the prosecutor ask the question?

The State then asked a series of questions that elicited responses from Janis to suggest she understood the following: the charge against her; the proceedings; the identity of the State's counsel, the defense attorney, and the judge; the role of the defense attorney; and the fact that she was at her trial.

Family court issued its oral verdict finding Janis guilty of Criminal Contempt of Court for violating the TRO. The court noted it was concerned "because as you well know, there seems to be sometimes when you kinda slip in and out of the mental health dimension[]" and asked Janis whether she needed a mental health assessment. In response, Janis stated that OCCC assessed her, found there was nothing wrong with her, and told her she could stop taking medications. Even so, she stated, "I have to take Lithium, Abilify, and Propanolol." She also informed family court she had a court order from Las Vegas specifically stating that she could choose whatever medications she thought she needed. Finally, Janis observed that OCCC had not been able to transfer her to "Module 20" because the prosecutor had wanted "a one-panel," apparently indicating she was confined to a mental health ward while at OCCC.

Janis's mental health history, the uncertainty as to whether she had access to necessary medication, her behavior at trial, her unrealistic beliefs, and her unwillingness to cooperate with her attorney or the State's attorney are all relevant to family court's determination of the need for further

inquiry to determine fitness.  During the course of the trial, the State and family court both appeared to question Janis's fitness to proceed, as evidenced by the additional questions to confirm Janis's understanding of the charge and her awareness of the trial, its purpose, and assistance being provided by defense counsel.

We conclude there was substantial evidence and a rational basis to have reason to doubt Janis's competency to stand trial.  Therefore, family court abused its discretion when it failed to suspend the proceedings and order a qualified examiner to examine and report on Janis's physical and mental condition before a determination was made as to her fitness to stand trial.  HRS § 704-404(1), (2).

Because we vacate the Judgment and remand this case for an examination to evaluate Janis's fitness to proceed, we need not address Janis's contention that defense counsel provided ineffective assistance of counsel.

## IV.  CONCLUSION

The Judgment of Conviction and Sentence filed on August 24, 2010 in Family Court of the First Circuit is vacated and remanded to family court for proceedings consistent with this opinion.

DATED:  Honolulu, Hawai'i, May 31, 2012.

On the briefs:

Glenn D. Choy
for Defendant-Appellant.

Clinton G. Piper
Deputy Prosecuting Attorney
City & County of Honolulu
for Plaintiff-Appellee.

Chief Judge

Associate Judge

Associate Judge